UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| PUBLICATIONS INTERNATIONAL LIMITED, | ) | |
|---|---|---|
| Plaintiff, | ) ) ) | No. 13 C 05532 |
| v. | ) ) ) | Judge Edmond E. Chang |
| MINDTREE LIMITED, | ) ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Publications International Limited has brought this suit against Mindtree Limited, alleging breach of contract (Count One), breach of express warranty (Count Two), negligence (Count Three), willful and wanton misconduct (Count Four), and fraudulent concealment (Count Five).[1] R. 43, Am. Compl. Mindtree has moved to dismiss Counts Two through Five and to partially dismiss Count One under Federal Rule of Civil Procedure 12(b)(6). R. 44. For the reasons stated below, Mindtree's motion is granted.

**I. Background**

In evaluating Mindtree's motion to dismiss, the Court accepts as true the factual allegations in the complaint and draws reasonable inferences in Publications's favor. *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2079 (2011). Publications publishes reviews of consumer products, including (until recently) consumer

---

[1]The Court has subject matter jurisdiction over this case based on 28 U.S.C. § 1332. Mindtree has also filed counterclaims against Publications. *See* R. 46, Def.'s Answer & Counterclaims. These counterclaims are not at issue in this motion to dismiss.

automotive information that appeared on its Consumer Guide Automotive website. Am. Compl. ¶¶ 6-7. Mindtree is an India-based company that provides information-technology services, including software and hardware design and development, website-infrastructure management, and technical support. *See id.* ¶¶ 2, 10-13. In October 2012, Publications hired Mindtree to develop, host, and manage Publications's Consumer Guide Automotive website. *Id.* ¶¶ 7-8. Publications and Mindtree executed a Master Consulting Agreement on October 31, 2012, that set out the overarching details of the parties' relationship. *Id.* ¶ 15; R. 45-1, Master Agreement. The two companies also agreed that the specific details of each project would be spelled out in separate "Statements of Work" that would then be incorporated into the Master Agreement. Am. Compl. ¶ 15; Master Agreement § 1. If a dispute arose between the parties about the quality of Mindtree's work, the Master Agreement specified that "MindTree's maximum liability regarding or relating to this Agreement or for breach of same shall be limited to amounts paid by [Publications] under the specific [Statement of Work] from which the liability is claimed to have arisen." Master Agreement § 15. The Master Agreement made clear that, aside from the Statements of Work, the Master Agreement was "the entire agreement" between Publications and Mindtree, that it "supersedes any prior understandings relating to the subject matter hereof," and that the Agreement "may be amended or supplemented only in a written agreement signed by MindTree and [Publications]." *Id.* § 16.

2

The website, which was launched in March 2013, ultimately did not live up to Publications's expectations, leading to this lawsuit. Am. Compl. ¶ 27. In the first four counts of its complaint, Publications alleges that Mindtree has breached several parts of the Master Agreement. According to Publications, the website that Mindtree built is not functioning as specified in the Master Agreement and the various Statements of Work. *See, e.g., id.* ¶¶ 17, 20-38. Publications brought these technical errors to Mindtree's attention, but Mindtree was allegedly not able to quickly correct the problems. *Id.* ¶ 17. Publications claims that these breaches have caused significant damage to Publications's business by negatively impacting Publications's Internet search rankings, the amount of traffic to its website, and its revenue and profits. *Id.* ¶ 16.

In the last count of its complaint, Publications raises a fraudulent-concealment claim. Publications alleges that Mindtree deliberately withheld information about Mindtree's problems implementing third-party software that Publications purchased from Magnolia Americas, Inc. to use with the website. *Id.* ¶¶ 74, 87. According to the complaint, Mindtree only "partially" followed Magnolia's recommendations for how to improve issues with "data import and activation performance" involved with the software. *Id.* ¶¶ 75-76. And "in or about June of 2013," Mindtree allegedly failed to properly use the Magnolia software to re-size and upload images to the website. *Id.* ¶¶ 78-80.

Ultimately, Publications believes that Mindtree was incapable of providing the services that Mindtree agreed to provide under the Master Agreement. *Id.* ¶ 17.

Publications asserts that the website's problems demonstrate that Mindtree either purposefully misrepresented its ability to do the work on the website or handled the work negligently or with wanton and reckless disregard for the normal standard of care. *Id.* ¶ 18. In response, Mindtree has filed this motion to dismiss certain claims.

## II. Legal Standard

"A motion under Rule 12(b)(6) challenges the sufficiency of the complaint to state a claim upon which relief may be granted." *Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). "[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). These allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. The allegations that are entitled to the assumption of truth are those that are factual, rather than mere legal conclusions. *Iqbal*, 556 U.S. at 678-79.

Ordinarily, under Federal Rule of Civil Procedure 8(a)(2), a complaint generally need only include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This short and plain statement must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555 (alteration in original) (internal quotation marks and citation omitted). The Seventh Circuit has explained that this rule "reflects a liberal notice pleading regime, which is intended to 'focus litigation on the merits of a claim' rather than on technicalities that might keep

4

plaintiffs out of court." *Brooks v. Ross*, 578 F.3d 574, 580 (7th Cir. 2009) (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514 (2002)).

But claims alleging fraud must also satisfy the heightened pleading requirement of Federal Rule of Civil Procedure Rule 9(b), which requires that "[i]n alleging fraud or mistake, a party must state *with particularity* the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b) (emphasis added). Thus, Rule 9(b) "require[s] the plaintiff to state the identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." *Uni*Quality, Inc. v. Infotronx, Inc.*, 974 F.2d 918, 923 (7th Cir. 1992) (internal quotation marks and citation omitted). Put differently, the complaint "must describe the who, what, when, where, and how of the fraud." *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.*, 631 F.3d 436, 441-42 (7th Cir. 2011) (internal quotation marks and citation omitted).

## III. Analysis

### A. Breach of Express Warranty (Count Two)

In its claim for breach of express warranty, Publications alleges that Mindtree breached an "express warranty to use a level of care of an experienced and knowledgeable IT Company." Am. Compl. ¶ 47. Under Illinois law,[2] because "express warranties are contractual in nature, the language of the warranty itself is what controls and dictates the obligations and rights of the various parties." *Oggi*

---

[2]The Court must apply state substantive law in diversity cases. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). Here, the parties agreed in the Master Agreement that Illinois law applies. Master Agreement § 16.

*Trattoria & Caffe, Ltd. v. Isuzu Motors Am., Inc.*, 865 N.E.2d 334, 340 (Ill. App. Ct. 2007) (internal quotation marks and citation omitted); *see also Collins Co. v. Carboline Co.*, 532 N.E.2d 834, 838 (Ill. 1988) ("[T]he warrantor is the master of the express warranty. The warranty arises only because the warrantor has willed it into being by making the requisite affirmation as part of a contract to which it is an adjunct." (citations omitted)).

Although a series of express warranties appear in section 13 of the Master Agreement, none of these warranties includes the warranty that Publications alleges in its complaint—a warranty "to use a level of care of an experienced and knowledgeable IT Company." *Compare* Am. Compl. ¶ 47, *with* Master Agreement § 13; *see also* R. 49, Pl.'s Resp. Br. at 7 (conceding that this alleged warranty is "separate and apart from the terms of the agreement"). What's more, the Master Agreement disclaims that this asserted warranty exists. In bold, capitalized letters, set apart in a separate paragraph, the Master Agreement states: "Except as expressly set forth in the immediately preceding paragraph, Mindtree makes no warranties or representations of any kind, whether express or implied, including the implied warranties of merchantability, quality, fitness and non-infringement." Master Agreement § 13. The Master Agreement also contains an integration clause that reinforces the position that the only warranties that Mindtree made appear in the Master Agreement itself. *See id.* § 16 ("This Agreement constitutes the entire agreement between the Parties, supersedes any prior understandings relating to the subject matter hereof, and may be amended or supplemented only in a written

agreement signed by MindTree and [Publications]."). Illinois courts have readily enforced disclaimers that are similarly conspicuous. *See, e.g.*, *Bell Fuels, Inc. v. Lockheed Elecs. Co.*, 474 N.E.2d 1312, 1317 (Ill. App. Ct. 1985) (enforcing a disclaimer in large-type capital letters and set apart from the express warranty as its own paragraph). This Court likewise must enforce the disclaimer in the Master Agreement.

In response, Publications points to an undefined "deliverables warranty" in section 13.[3] *See* Pl.'s Resp. Br. at 5-6 (citing Master Agreement § 13, at 8). It is true that there is an incomplete sentence in this provision of the Master Agreement, leaving this "deliverables warranty" undefined. Specifically, the provision starts out by saying, "For a period of thirty (30) days from the date of completion of the Services under a Statement of Work, at no additional charge to the Client," but then trails off after that. Master Agreement § 13. The next sentence begins, "The Deliverables Warranty shall not apply in the following cases," and, rather than defining the "deliverables warranty," the Agreement merely lists the circumstances under which that warranty will not apply. *See id.* This incomplete provision appears to be a typographical error of some sort. In any event, even if the parties intended to say something binding with that provision, this deliverables warranty is not clear enough to be the express warranty that Publications has alleged that Mindtree

---

[3]Without analysis, Publications also makes the conclusory argument that the Master Agreement is a contract of adhesion. *See* Pl.'s Resp. Br. at 6 n.5. But the Master Agreement itself undercuts Publications's argument. *See* Master Agreement § 16 ("Both Parties have had the opportunity to have this Agreement reviewed by an attorney; therefore, neither this Agreement nor any provision hereof shall be construed against the drafter of this Agreement.").

7

breached. Because the Agreement's integration clause dictates that the Master Agreement is a complete expression of the parties' entire agreement, the Court cannot look outside the contract to extrinsic evidence to shed light on this undefined deliverables warranty.[4] *See Air Safety, Inc. v. Teachers Realty Corp.*, 706 N.E.2d 882, 885-86 (Ill. 1999). Finally, even if the deliverables warranty meant anything at all, it is now expired: the Agreement clearly states that the deliverables warranty (whatever it was) is only valid for thirty days from completion of services. Master Agreement § 13.

In short, Publications has failed to state a claim for breach of express warranty because the Master Agreement does not contain the express warranty that Publications alleges, and instead disclaims all warranties that are not contained in the Agreement. There is no fixing this claim with an amendment to the complaint, so this claim (Count Two) is therefore dismissed with prejudice.

### B. Negligence and Willful and Wanton Misconduct
### (Counts Three and Four)

Next, Publications asserts claims for negligence and willful and wanton misconduct. Under Illinois law, these claims are barred by the economic-loss doctrine, which prohibits Publications from using tort law to recover economic damages for contract-based claims. *See Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 567 (7th Cir. 2012); *Moorman Mfg. Co. v. Nat'l Tank Co.*, 435 N.E.2d 443, 453 (Ill. 1982) (holding that a plaintiff "cannot recover for solely economic loss under the tort theor[y] of . . . negligence"). In other words, "[t]he economic loss doctrine denies

---

[4]For the same reason, the Court also will not consider any warranties that Mindtree allegedly made on its website. *See* Pl.'s Resp. Br. at 7.

8

a tort remedy for product defects when the loss is rooted in disappointed contractual or commercial expectations." *Am. United Logistics, Inc. v. Catellus Dev. Corp.*, 319 F.3d 921, 926 (7th Cir. 2003) (internal quotation marks and citation omitted).

Publications raises three arguments for why the economic-loss doctrine should not bar these two tort claims. None of those arguments save its claims. First, Publications argues that its damages "go[] far beyond 'purely economic' damages" and include harm to its Internet presence, its search rankings, its ability to conduct business over the Internet, its reputation, and its trademark. Pl.'s Resp. Br. at 3, 8; *see also* Am. Compl. ¶¶ 53, 58, 61. But under Illinois law, all of these alleged damages are still economic damages stemming from Mindtree's alleged breach of contract. *See Cloverhill Pastry-Vend Corp. v. Cont'l Carbonics Prods., Inc.*, 574 N.E.2d 80, 83 (Ill. App. Ct. 1991) (holding that "the intangible and consequential damages of lost profits, lost business, and damage to reputation and goodwill" are "purely economic damages"). Publications resists this characterization of its damages, arguing that its damages fall outside the economic-loss doctrine's bar because it has suffered "property loss." *See* Pl.'s Resp. Br. at 8. It is true that intellectual property, like a website, could be damaged in a way that would not stem from a breach of contract. A fire, for example, could destroy the server that hosts Publications's website. But that is not the kind of damage that has occurred here. Instead, the only damages that Publications has suffered arise from Mindtree's alleged breach of contract.

Next, Publications argues that, even if the economic-loss doctrine does apply, its allegations fall within one of the exceptions to the doctrine. *See id.* at 8-10. The Illinois Supreme Court has articulated three general exceptions to the economic-loss doctrine: (1) where the plaintiff sustains personal injury or property damage after a sudden or dangerous event; (2) where the plaintiff's damages are proximately caused by a defendant's fraud; and (3) "where the plaintiff's damages are proximately caused by a negligent misrepresentation by a defendant in the business of supplying information for the guidance of others in their business transactions." *First Midwest Bank, N.A. v. Stewart Title Guar. Co.*, 843 N.E.2d 327, 333-34 (Ill. 2006). Publications argues that the negligent-misrepresentation exception applies to this case. *See* Pl.'s Resp. Br. at 9-10.

This argument, too, fails to save Publications's tort claims. For one, a negligent-misrepresentation claim is nowhere to be found in Publications's complaint. Instead, Count Three of Publications's complaint pleads the elements of a traditional negligence claim. *See* Am. Compl. ¶¶ 49-54. On top of that, Mindtree is not "in the business of supplying information for the guidance of others in their business transactions." *First Midwest Bank*, 843 N.E.2d at 333-34. The allegations make clear that Mindtree was providing a product and services to Publications—a website and management of the website. *See* Am. Compl. ¶ 8; *cf. Black, Jackson & Simmons Ins. Brokerage Inc. v. Int'l Bus. Machines Corp.*, 440 N.E.2d 282, 284 (Ill. App. Ct. 1982) (holding that IBM and a software company were not in the business of supplying information), *overruled on other grounds by Fireman's Fund Ins. Co. v.*

*SEC Donohue, Inc.*, 679 N.E.2d 1197, 1200 (Ill. 1997); *cf. also Budget Rent a Car Corp. v. Genesys Software Sys., Inc.*, No. 96 C 0944, 1997 WL 201549, at *5 (N.D. Ill. Apr. 17, 1997) (holding that a "software designer" is not a "supplier of information"); *Walter Raczynski Prod. Design v. Internal Bus. Machines Corp.*, No. 92 C 6423, 1994 WL 247130, at *2 (N.D. Ill. June 6, 1994) (collecting cases holding that computer hardware and software manufacturers do not meet the definition of businesses engaged in providing information). And any information that Mindtree provided to Publications while building the website was purely ancillary to the ultimate product and service—the website and the management of it. *See Tolan & Son, Inc. v. KLLM Architects, Inc.*, 719 N.E.2d 288, 296 (Ill. App. Ct. 1999) ("Where the information is merely ancillary to the sale of a product or service . . . , defendant will not be found to be in the business of supplying information for the guidance of others in their business dealings."). Therefore, the negligent-misrepresentation exception to the economic-loss doctrine does not apply in this case.

Finally, Publications argues that Mindtree owed Publications an "extra-contractual duty" because the relationship between the two companies was analogous to the contractual relationship between a client and a lawyer or a client and an accountant. *See* Pl.'s Resp. Br. at 7, 11-13. Case law, however, does not support Publications's argument. The Illinois Supreme Court has only recognized exceptions to the economic-loss doctrine for professional malpractice claims in contexts where there has been a "long established practice and custom" of allowing professional malpractice suits against a group of professionals. *Collins v. Reynard*,

11

607 N.E.2d 1185, 1186-87 (Ill. 1992) (recognizing an exception to the economic-loss doctrine for lawyer malpractice claims); *see also Congregation of the Passion, Holy Cross Province v. Touche Ross & Co.*, 636 N.E.2d 503, 515 (Ill. 1994) (distinguishing a negligence claim against an architect from a professional-malpractice claim against an accountant because "[t]ort law has traditionally afforded an avenue of recovery for accountant malpractice"). And in the context of claims against website developers, there is no practice or custom of allowing professional malpractice claims. What's more, lawyers and accountants have fiduciary relationships with their clients, whereas no fiduciary relationship exists between two companies, like Publications and Mindtree, that have simply entered into an arm's-length transaction for a product. *Cf. Catalan v. GMAC Mortg. Corp.*, 629 F.3d 676, 693 (7th Cir. 2011) ("[T]he contract itself cannot give rise to an extra-contractual duty without some showing of a fiduciary relationship between the parties."). Mindtree therefore owed no extra-contractual duties to Publications.

In sum, because the economic-loss doctrine bars Publications's tort claims for negligence and willful and wanton misconduct, the Court dismisses those claims (Counts Three and Four) with prejudice.

### C. Fraudulent Concealment (Count Five)

In Count Five of its complaint, Publications attempts to allege a fraudulent-concealment claim. "In order to show fraudulent concealment, a plaintiff must prove that the defendant concealed a material fact when he was under a duty to disclose that fact to plaintiff." *Benson v. Stafford*, 941 N.E.2d 386, 402 (Ill. App. Ct. 2010)

(internal quotation marks and citation omitted). Mindtree argues that this claim fails for either of two alternative reasons. R. 45, Def.'s Br. at 13. First, Publications's allegations fail to satisfy Rule 9(b)'s heightened pleading standard. Second, Publications fails to allege facts supporting its argument that Mindtree had a duty to disclose any of the facts that were allegedly concealed. The Court agrees with Mindtree.

Because a fraudulent-concealment claim is subject to Rule 9(b)'s heightened pleading requirements, *see Pirelli*, 631 F.3d at 446-47, the facts alleged to support that claim must be "state[d] with particularity," Fed. R. Civ. P. 9(b). In its complaint, Publications identifies two problems that Mindtree was having with the Magnolia software. First, "in approximately mid-December 2012," Mindtree allegedly only "partially" followed Magnolia's "specific recommendations" about "data import and activation performance problems." Am. Compl. ¶¶ 75-76. Then, "in or about June of 2013," Mindtree had problems using the Magnolia software's "Imaging Module" to re-size and upload images to the website. *See id.* ¶¶ 78-80. Publications then alleges that, "[i]n or about mid-December 2012 and May of 2013," Mindtree concealed its inability to properly use the Magnolia software and also concealed the "various problems" it was having with the software. *Id.* ¶¶ 83-87. Because Publications was not aware of these problems, Publications alleges that it mistakenly believed that the website project was progressing as scheduled. *Id.* ¶ 88. Had it known about these problems, Publications alleges that it would have terminated the project with Mindtree and hired a different IT company. *Id.* ¶ 89.

Altogether, Publications's fraudulent-concealment claim lacks the required specificity. It is true that Publications has alleged what was concealed and when. For example, Publications alleges that the concealment was related to "data import and activation" recommendations from Magnolia, as well as the problems with the "Imaging Module." *Id.* ¶¶ 75, 78. And Publications does provide a timeframe—mid-December 2012 and May 2013—for when the alleged concealment occurred. *Id.* ¶ 85. But even though Publications's complaint may have alleged the "what" and "when" of its fraud claim, the complaint has no allegations about the "who," "where," and "how." *See Pirelli*, 631 F.3d at 441-42 (citation omitted). For example, it is unclear which Mindtree employees allegedly concealed this information, and in what context Publications would have expected Mindtree to reveal this information. Without the "who" and "how," Publications would need to provide more precision on the dates that this information was concealed and in what context. All in all, Publications's fraudulent-concealment allegations therefore fall short of Rule 9(b)'s specificity requirement.

In response, Publications argues that the Court should relax the Rule 9(b) standard in this case because many of the concealed facts were solely within Mindtree's knowledge. Pl.'s Resp. Br. at 15-16. But the complaint itself undercuts Publications's argument. For example, Publications alleges that two weeks before filing its amended complaint, Publications was "able to ascertain from Magnolia various relevant facts which support [Publications's] claims that Mindtree was not equipped to handle and properly utilize the [Magnolia] Software." Am. Compl. ¶ 74.

But even though Publications learned these "relevant facts" directly from Magnolia, Publications fails to allege what those facts specifically are, and more importantly, who at Mindtree concealed those facts and how. Although plaintiffs in purported fraud cases might have trouble uncovering facts that were concealed, and it is appropriate to consider that difficulty in applying Rule 9(b), the Rule nevertheless raises the bar before permitting discovery.[5] And here, Publications has failed to meet that heightened pleading requirement.

Next, even if Publications had satisfied Rule 9(b), it still failed to state a claim for fraudulent concealment because Mindtree did not owe Publications a duty to disclose any material facts. To state a claim for fraudulent concealment, "a plaintiff must allege that the defendant intentionally omitted or concealed a material fact that it was under a duty to disclose." *Wigod*, 673 F.3d at 571 ("A duty to disclose would arise if 'plaintiff and defendant are in a fiduciary or confidential relationship' or in a 'situation where plaintiff places trust and confidence in defendant, thereby placing defendant in a position of influence and superiority over plaintiff.'" (quoting *Connick v. Suzuki Motor Co.*, 675 N.E.2d 584, 593 (Ill. App. Ct. 1996))).

Here, Publications alleges that it "placed trust and confidence in Mindtree, thereby placing Mindtree in a position of influence and superiority over

---

[5]Publications's fraud claim appears to be closely related to its breach-of-contract claim, on which discovery will continue. If, in the course of discovery on the contract claim, Publications uncovers additional facts related to this fraudulent-concealment claim, Publications may have the basis to ask for leave to amend its complaint. But as it is drafted now, Publications's current fraudulent-concealment claim does not satisfy Rule 9(b)'s particularity standard.

15

[Publications]." Am. Compl. ¶ 63. This allegation, however, is nothing more than a legal conclusion, and the Court is therefore not required to accept it as true. *See Iqbal*, 556 U.S. at 678-79. Looking instead to the *facts* in the complaint, it is clear that the relationship between Publications and Mindtree was merely the product of an arm's-length transaction. *See Wigod*, 673 F.3d at 573 (holding that no duty to disclose existed when the parties' relationship was the product of an "arm's-length transaction"); *Miller v. William Chevrolet/GEO, Inc.*, 762 N.E.2d 1, 13-14 (Ill. App. Ct. 2001) (holding that an "arms length transaction" between a car dealer and a customer "did not give rise to a confidential relationship sufficient to impose a general duty of disclosure under the fairly rigorous principles of common law"). For one, Publications was not an unsophisticated company; it is a very successful publishing company with an established Internet presence. *See* Am. Compl. ¶ 6. And although Publications alleges that it relied on Mindtree's expertise in website development, *see id.* ¶¶ 14, 63, reliance is a separate element of the fraud cause of action, apart from the duty to disclose, *see Benson*, 941 N.E.2d at 845-47; *see also Wigod*, 673 F.3d at 573 ("[A]symmetric information alone does not show the degree of dominance needed to establish a special trust relationship.").

The Master Agreement itself also undercuts Publications's argument that Mindtree owed it a duty to disclose material facts. For example, the Agreement gave Publications the right to demand changes to the agreement, required both parties to approve of any proposed changes, and specified that both parties "will use commercially reasonable efforts" to discuss and modify the various Statements of

Work to which the parties agree while developing the website. *See* Master Agreement §§ 1, 2 The Agreement thus contemplated an ongoing exchange between the parties and vested considerable discretion in Publications—an arrangement that stands in sharp contrast to the picture of one-sided dominance and expertise that Publications paints. Moreover, these provisions suggest that, during the negotiation process about whether to purchase the Magnolia software, Publications could have asked both Magnolia and Mindtree questions about the software and also asked for an explanation of why the Magnolia software in particular was necessary. Ultimately, these provisions in the Master Agreement make it less likely that Publications will discover facts to support successfully amending its fraudulent-concealment claim. The Master Agreement is simply not the type of agreement that would normally be associated with a party who has a duty to disclose.

Finally, Publications cites two cases to support its argument that Mindtree has a duty to disclose, but the cases only support the general proposition of the duty to disclose, and Publications makes no attempt to analogize to the facts of those cases. *See* Pl.'s Resp. Br. at 19 (citing *McMahan v. Deutsche Bank AG*, 938 F. Supp. 2d 795, 805 (N.D. Ill. 2013), and *Connick v. Suzuki Motor Co.*, 675 N.E.2d 584 (Ill. 1997)). The one case that the Court identified that found a relationship of "trust and confidence," without there also being a fiduciary relationship, does not support Publications's argument. *See Schrager v. N. Cmty. Bank*, 767 N.E.2d 376 (Ill. App. Ct. 2002). In *Schrager*, the court found that there was a relationship of trust and

confidence between a bank and a loan guarantor because the bank knew about the financial status of the guarantors' potential investment partners (who happened to be customers of the bank), including that one of the investment partners was a debtor in a pending bankruptcy proceeding. *Id.* at 379, 384-86. Because the bank had this detailed knowledge about the investment partners, *Schrager* held that the bank breached its duty to disclose when it misled the guarantor about the investment partners' financial status. *Id.* at 386. Here, there are no allegations in the complaint suggesting that Mindtree had a deeper relationship with Magnolia than Publications did or that there was anything standing in the way of Publications gaining more information about Magnolia and its software. Indeed, it was Publications, *not* Mindtree, that actually purchased the license for the Magnolia software. *See* Am. Compl. ¶ 70. In short, Publications's complaint fails to allege any facts supporting its claim that Mindtree owed Publications a duty to disclose.

To summarize, Publications's has failed to state a claim for fraudulent concealment because its complaint does not satisfy Rule 9(b)'s heightened pleading requirement and because the complaint does not allege facts supporting that Mindtree owed Publications a duty to disclose its problems with the Magnolia software. Count Five is therefore dismissed, though without prejudice. If additional facts are revealed during discovery, Publications may try to refine its complaint for both particularity and the duty to disclose.

## D. Breach of Contract (Count One)

Lastly, Mindtree moves to partially dismiss Publications's breach-of-contract claim, arguing that the damages related to this claim should be limited only to the amount that Publications paid Mindtree under the October 2012 Statement of Work. Def.'s Br. at 18. The Master Agreement states that "MindTree's maximum liability regarding or relating to this Agreement or for breach of same shall be limited to amounts paid by [Publications] under the specific [Statement of Work] from which the liability is claimed to have arisen." Master Agreement § 15. According to Mindtree, because Publications's complaint only alleges that Mindtree breached its obligations under the October 2012 Statement of Work, *see* Am. Compl. ¶ 40, Publications's damages should be limited to the amounts Publications paid Mindtree under that Statement of Work, *see* Def.'s Br. at 1-2. Publications's only response to this argument is that the Court should not enforce the Agreement's limitation-of-liability provision because Mindtree engaged in willful and wanton misconduct. *See* Pl.'s Resp. Br. at 19-20. That claim is out, however, as discussed above, and Publications makes no other arguments about any other Statements of Work. Because Publications has presented no viable argument for ignoring the limitation on liability, the Court grants Mindtree's partial motion to dismiss Publications's contract claim (Count One). Going forward, the Court will limit damages discovery on this claim to Publications's alleged damages under the October Statement of Work.

## IV. Conclusion

For the reasons stated above, Mindtree's motion to dismiss [R. 44] is granted. The status hearing on July 29, 2014, remains in place.

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: July 24, 2014